[Civil No. 943.    Filed May 12, 1906.]

[86 Pac. 7.]

## ALBERT STEINFELD et al., Defendants and Appellants, v. LOUIS ZECKENDORF, Plaintiff and Appellee.

1. MISTAKE OF LAW—NOT CORRECTED BY COURT OF EQUITY.—A mistake of law, as to the legal effect of an agreement, which is unconnected with a mistake of fact and where there is no fraud, imposition, or undue advantage, will not be corrected by a court of equity.

2. FINDINGS OF FACT—LEGAL EFFECT.—Where an agreement between a corporation and one of its stockholders after reciting that it was the

desire of the parties to settle the question of the disposition of the proceeds of the sale of a certain property, and after reciting that said stockholder had assumed certain obligations as a guarantor of the title of the property sold, contained provisions that said proceeds should be the property of the company, that said stockholder should hold the same as security against loss arising from his guaranty and that no dividend should be declared by the company until said stockholder should be indemnified from any such loss, it is impossible to read into this agreement any provision which establishes the property sold in either party, such agreement relating solely to the disposition of the proceeds, a finding of the court that the agreement was rescinded must be taken therefore, notwithstanding the finding of the court that the parties did not so construe the effect of their rescission, as an adjudication that all rights created by the agreement were abrogated by the parties.

3. APPEAL AND ERROR—FINDINGS—JUDGMENT—PRESUMPTIONS.—The supreme court may not assume that a judgment of a trial court was based on a certain finding of fact, where the trial court distinctly stated that no such finding was made.

4. SAME—SAME—MAY NOT BE MADE BY APPELLATE COURT WHERE EVIDENCE IS CONFLICTING.—Where the evidence on a given point is conflicting and no finding on such point was made by the trial court the appellate court may not make such finding and give judgment accordingly.

5. CORPORATIONS.— STOCKHOLDER'S SUITS — EVIDENCE — JUDGMENT.— Where the agreement between a corporation and one of its stockholders concerning the distribution of the proceeds of sale of certain properties was found by the court to have been rescinded *in toto,* in the absence of findings as to the ownership of certain stock of the company which was in dispute, as well as certain property, and as to the rights of the parties to the distribution of the proceeds of the sale, a judgment decreeing that the proceeds of the sale belonged to the corporation was erroneous because not supported by the findings.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Pima.  John H. Campbell, Judge.  Reversed.

Opinion on rehearing, 11 Ariz. —, 89 Pac. 496.

The facts are stated in the opinion.

Francis J. Heney, and Eugene S. Ives, for Appellant.

Edwin A. Meserve, and Frank H. Hereford, for Appellee.

SLOAN, J.—The appellee, Louis Zeckendorf, brought suit as a stockholder of the Silver Bell Copper Company in the district court of Pima County to recover, in behalf of said company, the proceeds of the sale of certain mining property alleged in the complaint to be wrongfully retained by the defendants, Albert Steinfeld, R. K. Shelton, and the Mammoth Copper Company, and to be the property of said Silver Bell Copper Company. The complaint charged that the board of directors of the Silver Bell Copper Company, which was made a party defendant, was composed of the defendants Steinfeld, Shelton, and one Curtis, and was dominated and controlled by the defendant Steinfeld, and that therefore the plaintiff had made no demand upon said board to bring the action, it being idle and purposeless to make such demand, for the reason that such action would not be prosecuted by said board in good faith; that therefore appellee, as a stockholder of said corporation, brought the suit for its use and benefit. From a judgment in favor of plaintiff, Zeckendorf, the defendants have appealed.

The record of the case is voluminous, and a complete statement of the facts would necessarily occupy more space than is desirable or necessary to a determination of the questions involved in this appeal. Such of the facts as bear directly upon the essential controversies are as follows:

The firm of Louis Zeckendorf & Co., during the times hereinafter mentioned, was composed of appellee, Louis Zeckendorf, and appellant, Albert Steinfeld, and was engaged in the mercantile business in the city of Tucson. In January, 1899, the Silver Bell Copper Company was organized for the purpose of taking over the title to a mining claim known as "Old Boot," situated in the Silver Bell mining district, Pima County, which had theretofore been held by Albert Steinfeld in trust for one William Zeckendorf. The capitalization of the company was twenty-five thousand dollars, divided into one thousand shares of the par value of twenty-five dollars each. At the time of the organization one Neilson was operating the mine under lease and was indebted to the firm of Louis Zeckendorf & Co. in excess of twenty thousand dollars. The stock of the company, with the exception of one share each given to Curtis and Shelton, was issued to Neilson, who divided it as fol-

lows:—J. N. Curtis received 169 shares, the firm of Louis Zeckendorf & Co. 529 shares, 499 of these being for its own use, and thirty shares being held by the firm as trustee for Julia Zeckendorf; Neilson retained three hundred shares. The mine was thereafter operated by the company, but at a loss, so that in May, 1903, it owed the firm of L. Zeckendorf & Co. the sum of one hundred and twelve thousand dollars. In June, 1900, Neilson sold his shares of stock to the defendant Steinfeld. The certificate for these shares of stock was made out in the name of Steinfeld, as trustee. In January, 1901, Steinfeld was elected a director of the company. Surrounding the "Old Boot" mine was a group of mining claims known as the "English Group"; these claims having been purchased by an English company prior to 1899. This group, prior to 1900, had been relocated by one Francis and one Volkert under the claim that the assessment work had not been done upon the property by the English company. The latter company continued to assert its title to the group upon the theory that Francis and Volkert being its employees at the time of the relocations, the latter inured to its benefit. In May, 1900, Steinfeld purchased the title held by Francis and Volkert for the sum of fifteen thousand dollars, two thousand five hundred dollars of which being in cash and the remainder, under the terms of the sale, to be paid when Steinfeld should sell the same. At the time of this purchase Steinfeld caused to be organized the Mammoth Copper Company, all of the shares of stock of which were owned by him. The conveyance of the Francis and Volkert title was made to the Mammoth Copper Company. In August, 1900, Steinfeld went to Europe and purchased from the English company its title to the group of mines and obtained a deed therefor. The purchase price paid by Steinfeld to the English company was the sum of $18,117. In the early part of 1901 the question as to the ownership of the three hundred shares of stock purchased from Neilson by Steinfeld, and of the "English Group" of mines, arose between Steinfeld and Curtis; the former claiming the absolute ownership of both the shares of stock and the mines, and the latter claiming that Steinfeld held the same in trust for the company. Curtis, thereupon, consulted S. M. Franklin, the company's attorney, and was advised by Franklin that Stein-

feld held both the stock and the mines as trustee for the corporation. This advice was reported by Curtis to Steinfeld. Upon receiving this advice Steinfeld demanded that interest be paid him by the company on the sums expended by him in the purchase of the stock and of the mines. Curtis, as the treasurer of the company, signed checks for said interest and sent them to Steinfeld. After the receipt of said checks by Steinfeld, he consulted with Franklin as to his rights. He was advised by Franklin that because of his relations to the company he had no legal right to make the purchases for his own benefit, but on the other hand, had no right to compel the company to assume such purchases; that it was his duty to give to the company an opportunity, within a reasonable time, to reimburse him for his outlays and to take over the property if it so desired, and that if the company should not avail itself of his offer, Steinfeld would then hold the properties as his own. After receiving said advice Steinfeld returned the checks for the interest to Curtis. After receiving this legal advice Steinfeld signed and submitted to the company a proposition, prepared by Franklin, offering to transfer the "English Group" of mines to the company upon the condition that the latter accept the proposition on or before the 15th of October, 1901, and pay to him the amount of his disbursements on or before said date. On July 15, 1901, the board of directors of the Silver Bell Copper Company passed a resolution calling a stockholders' meeting of the corporation to consider the proposition made by Steinfeld. No stockholders' meeting was, in fact, called or held. On October 1, 1901, at a meeting of the board of directors, Steinfeld proposed that, if the company would perform and pay for the assessment work on the "English Group" for the years of 1900, 1901, and 1902, he would extend his proposition from October 15, 1901, until September 15, 1902. A resolution was thereupon adopted, accepting said proposition and authorizing the performance of the assessment work agreed to be done. Nothing thereafter was done by either Steinfeld or by the company relating in any way to the acceptance or rejection of Steinfeld's proposition, and nothing was done towards carrying it into effect, aside from the doing of the assessment work for the years

1900, 1901, and 1902, which was required of the company by Steinfeld as a consideration for the extension of his proposition, until May 20, 1902. In April, 1903, an option was given to one George A. Beaton for the purchase of the "Old Boot" and the "English Group" of mines for the sum of five hundred thousand dollars. This option was signed by Steinfeld, the Mammoth Copper Company, and the Silver Bell Copper Company. On May 20, 1903, a sale, under this option, was consummated for five hundred and fifteen thousand dollars, and a deed signed by the parties before named was made of the properties to the Imperial Copper Company. Of the purchase price the sum of one hundred and fifteen thousand dollars was paid in cash at the time of sale, and four promissory notes each for one hundred thousand dollars, payable in three, six, nine, and twelve months after date, with interest, were given. As a condition upon which the deal was consummated, the Imperial Copper Company insisted that Steinfeld should personally guaranty title to the mines. Thereupon Steinfeld did agree to guaranty the title for one year, during which time the Imperial Copper Company was to apply for patents, and if any litigation arose the expense thereof was to be borne by Steinfeld. Upon the day when the sale to the Imperial Copper Company was consummated,—to wit, on May 20, 1903,—an agreement was entered into between Steinfeld and the board of directors of the Silver Bell Copper Company, which was incorporated in the minutes of the company, and which reads as follows:—

"This agreement, made this 20th day of May, 1903, between the Silver Bell Copper Company, a corporation organized and existing under the laws of the territory of Arizona, party of the first part, and the Mammoth Copper Company, a corporation organized and existing under the laws of the territory of Arizona, party of the second part, and Albert Steinfeld of Tucson, party of the third part, witnesseth: Whereas, the parties hereto have this day agreed to sell certain mining claims and property to the Imperial Copper Company, a corporation, as per written agreements heretofore made, and deeds for which property are now in escrow with the Phœnix National Bank, of Phœnix, Ariz.; and whereas, the parties hereto desire to settle and determine

as between themselves, what disposition shall be made of the proceeds of said sale; and whereas, the said Albert Steinfeld has assumed certain obligations with the said Imperial Copper Company, as more fully appears in the various agreements heretofore entered into by him in making such sale, and particularly in a certain guarantee agreement, wherein, amongst other things, said Steinfeld guarantees the title to certain mining claims so sold or agreed to be sold, and the parties of the first part and the second part desire to indemnify him against loss by reason of any of the said matters or things so done by him: Now therefore, in consideration of the premises, and of the sum of one dollar ($1.00) by each of the parties hereto to the other in hand paid, receipt whereof is hereby acknowledged, and it is hereby mutually agreed that the purchase price paid and to be paid upon the sale, shall belong to and be the property of the said Silver Bell Copper Company. And it is further agreed that the four promissory notes of one hundred thousand dollars ($100,000.00) each, this day executed by the Imperial Copper Company to the Silver Bell Copper Company, upon said' sale, as well as the proceeds of said promissory notes when collected, shall be held by the said Albert Steinfeld as trustee, and as security for, and indemnity against loss, damage or expense which may arise to him for or out of, or by reason of any and all obligations and liabilities which he has assumed with the said Imperial Copper Company, or any other person whatsoever. And it is further agreed that no dividend shall be declared by the said Silver Bell Copper Company until the stockholders of said company shall first have fully indemnified said Albert Steinfeld against loss which might arise to him in the future, from or on account of any such obligations or liabilities so assumed by him. In witness whereof, the said corporations, parties of the first and second part, have caused these presents to be signed by its president and secretary, and its corporate seal to be hereunto affixed by resolution of its board of directors, and the said Albert Steinfeld has hereunto placed his hand and seal the day and year first above written. In triplicate."

Prior to the execution of this agreement another agreement had been prepared, which recited that Steinfeld, in consideration of $18,117, paid by the company, transferred the

title of the entire group of mines to the Silver Bell Copper Company. This reference to the title in this draft of the agreement was made, as it appears, pursuant to an oral agreement reached on the day of the sale between Steinfeld and the other directors of the Silver Bell Copper Company to renew his proposition of July 15, 1901, upon the condition that the entire purchase price of the properties should be given him as security under his guaranty to the Imperial Copper Company, and that such purchase price should remain in his custody and control until he should be relieved from any responsibility incurred by him by reason of said guaranty. For some reason the latter agreement was not executed, but the one hereinbefore set forth was prepared and executed in its place. Under the agreement of May 20, 1903, Steinfeld received the one hundred and fifteen thousand dollars paid in cash by the Imperial Copper Company and the four promissory notes and held them under and by virtue of said agreement. Subsequently the right of Steinfeld to the control and possession of the proceeds of the sale of the mines was raised by appellee, Louis Zeckendorf, and a stockholders' suit was brought by the latter in San Francisco to wrest possession from Steinfeld of the notes then held by the Bank of California as Steinfeld's custodian. Growing out of this suit and of the dispute relating to the disposition made by Steinfeld of the proceeds of the sale, there arose many bitter controversies between Zeckendorf and Steinfeld. Zeckendorf insisted that the contract of May 20, 1903, ought not to be enforced, but should be rescinded. On the 26th of December, 1903, a stockholders' meeting of the Silver Bell Copper Company was held in the city of Tucson. At this meeting all of the stock was represented. A resolution was offered rescinding the agreement of May 20, 1903. This resolution was adopted by the unanimous vote of the stockholders. After the adjournment of the stockholders' meeting, a meeting of the directors of the company was held, at which the following resolution was adopted:—

"Be it resolved: (1) That the said resolutions passed by the directors on the said 20th day of May, 1903, be and the same are hereby rescinded and repealed. (2) That the said agreement heretofore recited in full, be rescinded and declared null and void. (3) That the president and treasurer of this company

be empowered to receive from the said Steinfeld and from the Bank of California all of the said funds and the two said notes of the Imperial Copper Company, which have not yet matured and to give his proper receipt therefor. (4) That the officers of this company be instructed to execute forthwith and deliver to the said Steinfeld and the Mammoth Copper Company an agreement rescinding the said agreement *ab initio*; and to do and cause to be done all such things and acts as may be necessary to accomplish and consummate the full rescission of said agreement, and that J. N. Curtis, the president and treasurer of the company be instructed to demand and receive from the Bank of California the said money and notes now held by the said bank."

After the directors' meeting and on the same day an agreement was executed between Steinfeld, the Mammoth Copper Company, and the Silver Bell Copper Company, annulling the resolution and rescinding the agreement of May 20, 1903, and Steinfeld thereupon repaid to Curtis, the treasurer of the Silver Bell Copper Company, the sum of $18,117, which had been paid to him on the twentieth day of May, 1903. The latter sum, Steinfeld testified, was paid him as consideration for the execution of the agreement of that date. Steinfeld thereafter turned over to Curtis, the treasurer of the company, the proceeds of the sale held by him, except the sum of $51,500, which had been garnished in a suit brought against the company. On the sixteenth day of January, 1904, the board of directors of the Silver Bell Copper Company made and adopted a resolution which recited that Steinfeld and the Mammoth Copper Company claimed the ownership of and right of possession of more than one half the purchase price of the property sold, and claimed that the value of the property conveyed by them exceeded in value the property owned by the company; that it had been agreed by and between Steinfeld and the Mammoth Copper Company and the Silver Bell Copper Company that the former should receive one half of the said proceeds and the Silver Bell Copper Company the remaining half, less certain commissions and amounts paid out to attorneys for services rendered the company. The resolution provided that the distribution should be made in accordance with this agreement, and further provided the manner in which it should be made. On the same day an-

other resolution was adopted by said board which provided that a dividend of one hundred and eleven dollars on each share of the capital stock of the Silver Bell Copper Company should be paid to the shareholders of record. This dividend was based upon the distribution of the proceeds of the sale as provided in the preceding resolution. Thereafter a distribution of money was made in accordance with this resolution. The court gave judgment upon the theory that the Silver Bell Copper Company was entitled to the whole of the proceeds of the sale of the entire properties to the Imperial Copper Company.

It is obvious that the contentions arising from the record relate to the effect of the agreement of May 20, 1903, and of its rescission, upon the right of the Silver Bell Copper Company to all the proceeds derived from the sale of the entire property conveyed to the Imperial Copper Company, for the reason that the findings of the court do not determine the rights of the parties irrespective of these. The court expressly stated in the findings that it did not deem the issues raised by the pleadings as to the beneficiary ownership of the shares of stock purchased from Neilson by Steinfeld, and the beneficiary ownership of the "English Group" of mines prior to the twentieth day of May, 1903, as material to the judgment, for the reason that the agreement of May 20, 1903, established the beneficiary ownership of said stock and the purchase price of said mines in the Silver Bell Copper Company. The court found the facts above recited, which show that this agreement of May 20, 1903, was rescinded by the parties thereto on the twenty-sixth day of December, 1903, but found in the same connection that the resolution passed at the meeting of the stockholders of the Silver Bell Copper Company held on that day, while not procured by false representations, misconduct, or fraudulent practice, was not intended by the stockholders to advise, direct, consent, or assent to the rescission of any part of the agreement whereby the Silver Bell Copper Company became the owner of the entire purchase price of said property; and further found that in adopting said resolution the board of directors of the Silver Bell Copper Company did not intend thereby to cancel, rescind, or annul any part of the agreement affecting the ownership of the entire proceeds of the sale of said properties; that all of the actions

and purported actions of the said stockholders and said board of directors taken on the twenty-sixth day of December, 1903, had reference to the custody and not to the ownership of the proceeds of said sale. Assuming the fact to be sustained by the evidence that the parties to the agreement of May 20, 1903, in rescinding it did not intend thereby to affect all the provisions thereof, but only a part thereof, a question of law is thus presented. In the case of a written agreement which is plain, unequivocal in its terms, and these are known by all the parties, where a written agreement for its rescission is entered into by the parties which is equally plain, and which does not in any of its expressed or implied terms reserve from the operation of the rescission or attempt to continue in force thereafter any part of the agreement thus rescinded, but which nevertheless does not conform to the intent of the parties in that it was not contemplated by them that the rescission should affect a substantial part of the agreement, is such a mistake one of law or one of fact?

A mistake of law is an erroneous conclusion as to the legal effect of known facts. Anderson's Dictionary of Law. It is a general rule that a mistake of law, as to the legal effect of an agreement, which is unconnected with a mistake of fact, and where there is no fraud, imposition, or undue advantage, will not be corrected by a court of equity. *Bank of United States* v. *Daniel,* 12 Pet. 32, 9 L. Ed. 989; *Hunt* v. *Rousmaniere,* 1 Pet. 14, 7 L. Ed. 27. A mistake of fact is defined to be, in general, a mistake not caused by the neglect of any legal duty on the part of the person making the mistake, and which consists in his ignorance of some fact, past or present, material to the transaction, or in his belief in the existence of some fact, material to the transaction, which does not exist. Such a mistake may afford ground for relief in a court of equity. It seems clear from the findings of the court that the misapprehension of the parties as to the effect of the rescission of the agreement of May 20, 1903, was as to the legal effect of the language used in the agreement, and did not arise from any misapprehension of fact. There is no room for doubt as to the meaning of the resolution of the stockholders or of the resolution of the board of directors of the Silver Bell Copper Company or of the agreement of rescission, as these were expressed. The former unequivocally

refers to the agreement as an entirety, and the latter sets it forth in full, and specifically provides that it shall be rescinded, annulled, and held of no effect. It seems clear, therefore, under the well-established rule above stated that mistakes of law, unconnected with mistakes of fact, cannot be corrected by a court of equity, unless there be some fraud which in itself will afford ground for equitable relief, the agreement of May 20, 1903, without reference to the intent of the parties being otherwise than as expressed, must ·be regarded as rescinded as a whole. · The court specifically found that there was no fraud in the transaction. That the rescission cannot be construed otherwise than as an entirety is apparent from the nature of the agreement and the rights of the parties which were established therein. The agreement, after reciting that it was the desire of the parties to settle the question of the disposition of the proceeds of the sale, and after reciting that Steinfeld had assumed certain obligations as a guarantor of the titles of the properties, contained three provisions: 1. That said proceeds should be the property of the Silver Bell Copper Company; 2. That Steinfeld should hold the same as secuity against loss arising from said guaranty; and 3. That no dividend should be declared by the company until Steinfeld should be indemnified from any such loss. It is impossible to read into this agreement any provision which establishes title to any of the properties sold, either in Steinfeld or in the company. It relates wholly and entirely to the proceeds of the sale, and only establishes the disposition to be made of these proceeds. Again, the agreement, relating, as we have seen, to the distribution of the proceeds which had not at the time of its execution been made, was executory in its nature and remained such when this suit was brought. It therefore was as to all of its provisions the subject of rescission. Furthermore, its various provisions relating to but one thing,—namely, the disposition of the proceeds of the sale,—none of these can be severed from the whole without affecting the others. The finding of the court, that the agreement was rescinded, must be taken, therefore, notwithstanding the finding of the court that the parties did. not so construe the effect of their rescission, as an adjudication that all rights created by the agreement were abrogated by the parties.

With the agreement of May 20, 1903, out of the way, the court could determine the rights of the parties to the proceeds of the sale to the Imperial Copper Company solely, as it found the rights of ownership of the various parties to the three hundred shares of stock and to the "English Group" of claims to have been prior to the execution of said agreement. The court should have found the facts as to such ownership from the evidence in the case. We may not assume that the judgment was based upon such a finding of fact, for the reason that the court, as we have seen, distinctly stated that no such finding was made. Were the facts appertaining to the purchase by Steinfeld of the three hundred shares of stock, and of the "English Group" of mines, and his subsequent conduct relating thereto which may have determined the nature of his title, ascertainable, without the necessity of determining conflicting testimony, this court might find such facts and give judgment accordingly. The state of the record and the contradictory nature of some of the material evidence prevents us from so doing. The effect of the rescission of the agreement, in the absence of any findings as to the ownership of the three hundred shares of stock of the Silver Bell Copper Company, and of the "English Group" of mines, and as to the rights of the several parties to the distribution of the proceeds of the sale, is to leave the judgment unsupported upon these essential issues.

It is unnecessary to consider the question discussed in the briefs, whether the resolution of January 16, 1904, was void or merely voidable. It is quite clear that it is the subject of attack in this suit brought by Zeckendorf as a minority stockholder of the Silver Bell Copper Company, and that, should it appear that the company is entitled to any of the proceeds awarded to any of the appellees by the terms of the resolution, the latter is not binding upon him or the company.

For the reason that the findings do not support the judgment, it will be reversed, and a new trial granted.

KENT, C. J., and DOAN, J., concur.

NAVE, J.—I am unable to concur in the conclusion reached by the majority of the court. The minutes of the meeting of the board of directors of May 20, 1903, record the following, among other transactions:—

"The president reported that Mr. Albert Steinfeld, who had conducted the negotiations with the Imperial Copper Company, had again submitted for acceptance, the proposition which he had heretofore submitted in writing on July 15th, 1901, with the modifications, however, that this company shall pay to him forthwith in cash, the sums of money, which in said proposition were required to be paid on October 15th, 1901, . . . and that this company shall also assume and pay all obligations, which he, said Steinfeld, has incurred in conducting the negotiations and in making the sale of said mining claims and property to the Imperial Copper Company and keep him free and harmless from any and all expense and loss which may arise by reason of any claim or asserted claim, of any person whatsoever, for or on account of or arising out of or connected with the present sale and negotiations or any past negotiation or transaction in regard to said mining claims or any of them. And particularly that this company shall assume and pay unto N. O. Murphy the commissions which he, said Steinfeld, agreed to pay to said Murphy, to wit, the sum of $25,000, said agreement being made for and on behalf of this company and also shall keep him harmless from loss, damage or expense, by reason of the asserted claim of one J. M. Burnett for commission.

"Also that this company shall indemnify him against loss, damage and expense, by reason of his having guaranteed the titles to the mining claims sold or agreed to be sold to said Imperial Copper Company, as is set forth in the guarantee agreement heretofore submitted to this meeting. . . . He then submitted the agreement between this company, the said Mammoth Copper Company, and Albert Steinfeld, on this point, and also covering the matter of guarantee.

"After a full consideration the following resolutions were unanimously adopted, to wit:

"(1) 'Resolved, that all of the acts of the president and secretary of this corporation, and all papers, agreements and deeds signed by them for or on behalf of this corporation in the matter of the negotiation and sale by this company's property to the Imperial Copper Company, be, and the same hereby are, ratified, approved and confirmed.'

"(2) 'Resolved, that the proposition of Albert Steinfeld as herewith submitted be, and the same hereby is, accepted, and

that he, said Steinfeld, be forthwith paid by this corporation the sum of eighteen thousand one hundred and seventeen dollars ($18,117.00) and out of the first moneys received by this company upon the promissory notes of the Imperial Copper Company, he, said Steinfeld, as treasurer of this company, shall retain sufficient moneys to pay the amount necessary to be paid to Margaret Francis and Julius H. Volkert under the agreement with them aforesaid; and to pay to the assigns or legal representatives of Carl S. Neilson (he being now deceased) and to Mary Neilson, the amount necessary to be paid under the agreement with said Neilsons aforesaid; and, when said amounts respectively become due, to pay the same to the parties entitled thereto.'

"(3) 'Resolved, that Albert Steinfeld, as treasurer of this company, be and he is hereby authorized to pay N. O. Murphy whatever commissions may be coming to him.'

"(4) 'Resolved, that the agreement this day made by the president and secretary of the corporation with the Mammoth Copper Company and Albert Steinfeld, in regard to the disposition of the proceeds of the sale this day made to the Imperial Copper Company, and indemnifying said Steinfeld, be, and the same is hereby ratified, approved, and confirmed.'

"(5) 'Resolved, that the president and secretary of this corporation be, and they are hereby authorized, empowered and directed, in such manner and form as they deem necessary or proper, to indemnify said Steinfeld, against all loss, damage and expense that may arise to him by reason of his having guaranteed the titles to the properties so sold, or agreed to be sold to the said Imperial Copper Company and that he, and they hereby are, authorized, empowered and directed to do or cause to be done all things, and to execute all papers, documents or other writings, which they deem necessary in the premises.' "

The figures in parentheses prefacing the paragraphs of the resolutions are not in the original minutes, but are placed there by me for convenience of reference. The agreement mentioned in paragraph numbered 4 is that set forth in the majority opinion. I concur in the opinion of the majority of the court, that this agreement was rescinded in its entirety, for the reasons stated. But the proposition of July 15, 1901, referred to in the first portion of the minutes quoted, was a

proposition by Albert Steinfeld to the effect that upon reimbursement by the company for certain expenses he would hold the English group of mines and the three hundred shares of Neilsen stock in trust for the company. It is my view that upon the renewal and formal acceptance of that offer as recorded in these minutes, the beneficial ownership of the Neilsen stock and of the proceeds of the sale of those mines was established in the company, irrespective of former circumstances of ownership. (For brevity's sake I am not stating precisely the facts as to the Neilsen stock. It stands in somewhat different situation from that of the English group of mines, and the proceeds thereof, but the difference is immaterial with reference to the point. I am making.) Regarding the matter contained in the quoted minutes, there is no dispute. At the stockholders' meeting on December 26, 1903, Mr. Ives, as Mr. Steinfeld's attorney, produced a copy of the complaint filed in San Francisco by Mr. Zeckendorf, in which the latter sought a judicial annulment of the agreement referred to in paragraph 4 of the minutes. In that complaint Zeckendorf set forth *in hæc verba* the resolutions which I have numbered 4 and 5, and prayed for their annulment, together with the agreement. Mr. Ives read and there was entered upon the minutes of the stockholders' meeting, the prayer of that complaint, a portion of which is: "That the resolution and agreement therein referred to be declared null and void." The minutes of the stockholders' meeting disclose that the only resolution or resolutions referred to at any time in the meeting were the two paragraphs quoted in the Zeckendorf complaint. The stockholders unanimously adopted the following resolution: "Resolved, that the agreement executed on May 20th, by the president and secretary of the corporation with the Mammoth Copper Company and Albert Steinfeld, a copy of which is hereto annexed, be, and the same is, hereby rescinded; and that the said agreement and the resolution of the directors passed on said day, be declared null and void." The agreement annexed was the agreement quoted in the opinion in this case. What resolution was rescinded? Manifestly, not the entire body of resolutions which I have quoted. Manifestly, to my mind, the resolution rescinded was the only resolution referred to in anywise at the stockholders' meeting,—viz., the paragraphs set forth in Zeckendorf's complaint, which in my

extract from the minutes are paragraphs 4 and 5. The acceptance of Steinfeld's renewed offer of July 15, 1901, was untouched by the rescission. The sole effect of the rescission sought to be made by the stockholders would be to remove from Steinfeld the custody of the proceeds of the sale. If the directors and officers of the company went further than this and undertook to rescind the resolution or acts of the company by which the ownership of the Neilson stock, or of the proceeds of the sale of the mines, became established in the company, and to donate to, or revest in, if originally vested in, Steinfeld that stock or those proceeds, their acts being the acts of Steinfeld dealing with Steinfeld (adopting, as we should, the court's finding that the board of directors and the officers of the company were entirely under Steinfeld's domination), they cannot be countenanced or recognized as effective.

Therefore, while the findings of fact seem to refer to the agreement quoted in the opinion, as establishing the ownership of the proceeds of the sale in the company, the error is not material; the offer by Steinfeld, and its acceptance, effected on the same day as the execution of this indemnity agreement, the execution of which was but a partial fulfillment of the conditions attached by Steinfeld to the offer, in my opinion accomplished the adjustment of the ownership of those proceeds, and of the Neilson stock. To determine this fact, a retrial is unnecessary.

There appearing no other error in the record, the judgment should be affirmed.