[Civil No. 1101.   Filed March 20, 1909.]

[100 Pac. 784.]

LOUIS ZECKENDORF, Plaintiff and Appellant and Appellee, v. ALBERT STEINFELD, R. K. SHELTON, SILVER BELL COPPER COMPANY, a Corporation, and MAMMOTH COPPER COMPANY, a Corporation, Defendants, Appellees and Appellants.

1. TRUSTS—DUTY TO PERSON IN FIDUCIARY RELATION—PURCHASE OF PROPERTY IN INDIVIDUAL CAPACITY.—A person who is in duty bound to purchase and hold property for another may not purchase and hold the property as his own.

2. CORPORATIONS—OFFICERS—DUTIES—PURCHASE OF PROPERTY ON INDIVIDUAL ACCOUNT.—The rule that one may not purchase and hold as his own property which he is in duty bound to purchase for another applies to officers and directors of a corporation.

3. SAME—SAME—INDIVIDUAL TRANSACTIONS—PURCHASE OF PROPERTY.—Whether an officer of a corporation must refrain from purchasing property in his own name depends on whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer may hinder or defeat the plans and purposes of the corporation.

4. SAME — STOCKHOLDERS — FIDUCIARY RELATION TO CORPORATION.—A person who, though not a director in a corporation, was a managing partner of a firm owning the controlling interest in the corporation, and dominated the affairs of the corporation, and obtained knowledge as to the value to the corporation of property adjoining that owned by it, is held to the rule governing persons holding fiduciary relations to a corporation.

5. SAME—OFFICERS—DUTIES TO CORPORATION—ADVANCING MONEY FOR.— An officer or director of a corporation is under no duty to the corporation to loan money to it, or to purchase out of his own funds property for the use of the corporation which it is not in a position to purchase.

6. SAME—SAME—FIDUCIARY RELATION—PURCHASE OF PROPERTY.—The active manager of a firm which owned a controlling interest in a corporation caused the business of the corporation to be closed down for the alleged purpose of affecting the price at which he could buy adjoining property. *Held,* that, in the absence of a showing that the closing of the business prevented the corporation from obtaining the adjoining property, or had any influence over the price for which the property was sold, it could not be held as a matter of law that in purchasing the property for himself such manager violated any duty he owed to the corporation.

7. SAME—FIDUCIARY RELATION TO CORPORATION—PROMISE TO PURCHASE PROPERTY FOR CORPORATION.—An expressed intention by one holding a fiduciary relation to a corporation to purchase certain property for the benefit of the corporation did not constitute him a trustee *ex maleficio* for the corporation of such property purchased by him, unless his failure to carry into effect the intention had so changed the relation or situation of the corporation to its disadvantage with respect to the property purchased as would amount to constructive fraud.

8. TRUSTS—CONTRACTS TO HOLD IN TRUST—CONSIDERATION—EFFECT OF FAILURE.—The purchase, by one holding a fiduciary relation to another, of property for himself, which it would have been to the advantage of such other to have procured, was not fraudulent, though the purchaser had expressed an intention of purchasing and holding it for the beneficiary, where the latter did not part with or lose anything by virtue thereof, and hence the purchaser stood in the relation of a mere volunteer.

9. CORPORATIONS—FIDUCIARY RELATION OF OFFICERS—PURCHASE OF PROPERTY.—The fact that the corporation was put into possession of the property purchased and was given the right to work the same, and that maps and reports were made showing the property purchased to be a part of the corporation's property, all of which was done with the knowledge and acquiescence of the purchaser for the purpose of effecting a sale of the entire property, did not estop such purchaser from claiming the benefit of the purchase, in the absence of a showing that the corporation had been induced by these circumstances to

expend money on the property which it otherwise would not have spent.

10. SAME — CONTRACT BETWEEN STOCKHOLDER AND CORPORATION — RE-SCISSION—EFFECT.—The rescission of a contract between a corporation and a stockholder, by which the stockholder agreed to turn over to the corporation certain property which he had purchased in his own name, left the parties where they were before it was entered into, with no equitable or legal title to the property purchased in the corporation.

11. SAME—DIRECTORS—DELEGATION OF AUTHORITY—PERMITTING CONTROL BY ONE OF SEVERAL DIRECTORS.—Acts done by a director of a corporation under a resolution passed by him and two other directors, who were under his control, were not void unless there was some unfairness in the transaction apart from the circumstances under which the resolution was made.

12. SAME—OFFICERS—PURCHASES FOR CORPORATION.—A stockholder and director of a corporation purchased in his own name and in the name of the corporation certain stock belonging to another stockholder, agreeing that the seller was to be paid a part of the purchase price from the proceeds of the working of the company's property or from its sale. The transfer of the stock was made from the seller to the purchasing director as trustee. *Held,* that the purchasing director held the shares purchased as trustee for the corporation.

13. SAME—DISSOLUTION—RECEIVERS—APPOINTMENT.—The appointment of a receiver for a corporation which has ceased to do business, and the affairs of which are ready to be closed by the distribution of its assets among its stockholders, is proper, in the absence of a showing that any different disposition of the assets should or would be made by the company than is to be made by the receiver.

14. APPEAL AND ERROR—REVIEW—DISCRETION OF COURT—ALLOWANCE OF COSTS.—The amount to be allowed as attorney's fees being a matter within the discretion of the trial court, its determination in that regard will not be disturbed on appeal, where the appellate court cannot say as a matter of law that the trial court's discretion was abused.

APPEAL from a judgment of the District Court of the First Judicial District, in and for the County of Pima.   John H. Campbell, Judge.   Affirmed.

For former opinion, see 10 Ariz. 221, 86 Pac. 7.

The facts are stated in the opinion.

Edwin A. Meserve, and Frank H. Hereford, for Appellant Zeckendorf.

Under the circumstances as disclosed by the evidence in this case, Steinfeld was clearly and unquestionably a constructive

trustee in the purchase of the mines and stock, the basis of this action.    1 Am. & Eng. Ency. of Law, 2d ed., 1071–1085; *Kimberly* v. *Arms,* 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; 2 Pomeroy's Equity Jurisprudence, c. 7, particularly secs. 1089, 1090, and 1094; *Curtis* v. *Newton,* 58 Fed. 495; *Hallett* v. *Collins,* 10 How. 186, 13 L. Ed. 381; *Thredgill* v. *Pintard,* 12 How. 24, 13 L. Ed. 877; *Ringo* v. *Binns,* 35 U. S. (Pet.) 269, 9 L. Ed. 420; *Cragin* v. *Powell,* 128 U. S. 691, 9 Sup. Ct. 203, 32 L. Ed. 566; *Gower* v. *Andrew,* 59 Cal. 119, 43 Am. Rep. 242; *Paige* v. *Akins,* 112 Cal. 401, 44 Pac. 666; *Lockhart* v. *Rollins,* 2 Idaho, 503 (540), 21 Pac. 413, 16 Morr. Min. Rep. 16; *McClendon* v. *Bradford,* 42 La. Ann. 160, 7 South. 78, 8 South. 256; *Blount* v. *Robeson,* 56 N. C. 73; *Kroegher* v. *Calivada Colonization Co.,* 119 Fed. 641, 646, 647, 56 C. C. A. 257.

A contract entered into between a director and a corporation of which he is in control or where there is not a quorum of directors acting independently of him is conclusively presumed to be fraudulent and is void at the election of the corporation or a stockholder suing in its behalf, and its fairness or unfairness cannot be inquired into.    2 Cook on Corporations, 4th ed., sec. 734, p. 1588; note p. 1549, also secs. 734–879; also sec. 741, p. 1617; 3 Clark and Marshall on Private Corporations, 1674–1678, 1683, 1690; Morawetz on Corporations, sec. 517 et seq.; 3 Thompson on Corporations, secs. 4042 et seq. and 6503 et seq.; 3 Pomeroy's Equity Jurisprudence, sec. 1095; 21 Am. & Eng. Ency. of Law, par. 12, pp. 897, 990, 991; 1 Beach on Corporations, 241, 242, 246, 276; *Curtin* v. *Salmon River Co.,* 130 Cal. 345, 80 Am. St. Rep. 132, 62 Pac. 552; *Bassett* v. *Fairchild,* 132 Cal. 637, 64 Pac. 1082, 52 L. R. A. 611; *Graves* v. *Mining Co.,* 81 Cal. 303, 22 Pac. 665; *Wickersham* v. *Crittenden,* 93 Cal. 17, 28 Pac. 788; *Bensiek* v. *Thomas,* 66 Fed. 104, 13 C. C. A. 457; *Haywood* v. *Lincoln Lumber Co.,* 64 Wis. 639, 26 N. W. 184; *Jones* v. *Morrison,* 31 Minn. 140, 16 N. W. 854; 1 Am. & Eng. Corp. Cas. 313; *Davis* v. *Memphis Ry.,* 22 Fed. 883; *Sellers* v. *Phoenix Iron Co.,* 13 Fed. 20, 15 Morr. Min. Rep. 388; *Miner* v. *Bell etc.,* 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412; *Woodroof* v. *Howes,* 88 Cal. 184, 26 Pac. 111; *Beach* v. *Miller,* 130 Ill. 162, 22 N. E. 464, 17 Am. St. Rep. 291, and the monographic notes to this case and the numerous cases there cited and reviewed; *Smith* v.

*Los Angeles Em. etc. Assn.,* 78 Cal. 289, 12 Am. St. Rep. 53,
20 Pac. 677; *Goddell* v. *Verdugo Canyon Water Co.,* 138 Cal.
308, 71 Pac. 354; *Hodge* v. *Price Steel Co.,* 64 N. J. Eq. 807,
54 Atl. 1, 60 L. R. A. 742; *Slayback* v. *Raymond,* 40 Misc. Rep.
601, 83 N. Y. Supp. 15; *Shaw* v. *Davis,* 78 Md. 308, 28 Atl.
619, 23 L. R. A. 294; *Fox* v. *Hale & Norcross etc. M. Co.,* 108
Cal. 478, 41 Pac. 328; *Wardell* v. *Union Pacific R. R. Co.,* 103
U. S. 651, 26 L. Ed. 509, 7 Morr. Min. Rep. 144; *Bill* v. *West-
ern Union Tel. Co.,* 16 Fed. 14; *Copeland* v. *Johnson Mfg. Co.,*
47 Hun, 235; *Sellers* v. *Phoenix Iron Co.* (C. C.), 13 Fed. 20,
15 Morr. Min. Rep. 388; *Fitzgerald* v. *F. & M. Co.,* 41 Neb. 374,
59 N. W. 838; *Gray* v. *New York V. S. S. Co.,* 3 Hun, 383; *Barr*
v. *Northwestern etc. R. R. Co.,* 96 N. Y. 444; *George* v. *Central
R. & B. Co.,* 101 Ala. 607, 14 South. 752; *Bell* v. *Montgomery
L. Co.,* 103 Ala. 275, 15 South. 569; *Hannerty* v. *Standard
Theater Co.,* 109 Mo. 297, 19 S. W. 82; *Knoop* v. *Bohmrich,*
49 N. J. Eq. 82, 23 Atl. 118; *Bohmrich* v. *Knoop,* 50 N. J. Eq.
485, 27 Atl. 636; *Hardee* v. *Sunset Oil Co.* (C. C.), 56 Fed. 51;
*Martin* v. *Santa Cruz Water Storage Co.,* 4 Ariz. 171, 36 Pac.
36; *McConnell* v. *Comb, M. & M. Co.,* 30 Mont. 239, 104 Am. St.
Rep. 703, 76 Pac. 197; *Robertson* v. *H. E. Buchlen & Co.,* 107
Ill. App. 369; *The Telegraph* v. *Lee,* 125 Iowa, 17, 98 N. W.
364; *Adams* v. *Burke* (Ill.), 66 N. E. 235; *Stewart* v. *Harris,* 69
Kan. 498, 105 Am. St. Rep. 178, 66 L. R. A. 261, 2 Ann. Cas.
873; *Cook* v. *Sherman,* 20 Fed. 167, 4 McCrary, 20; *Meeker* v.
*Winthrop,* 17 Fed. 48, 109 U. S. 180, 3 Sup. Ct. 111, 27 L. Ed.
898; *Pickett* v. *School District No. 1,* 25 Wis. 551, 3 Am. Rep.
105; *Vandeveer* v. *Ashbury Park etc. Ry. Co.,* 82 Fed. 335; *Peo-
ple* v. *Township Board,* 11 Mich. 222; *Cumberland Coal Co.* v.
*Sherman,* 30 Barb. 553, 572, 1 Morr. Min. Rep. 322; *Ogden* v.
*Murray,* 39 N. Y. 202; *Doe* v. *Northwestern etc. Co.,* 78 Fed.
67; *Ten Eyck* v. *Pontiac St. R. R.,* 74 Mich. 226, 16 Am. St.
Rep. 633, 41 N. W. 905, 3 L. R. A. 378; *Borough of Milford* v.
*Milford W. Co.,* 124 Pa. 610, 17 Atl. 185, 3 L. R. A. 122;
*Pearson* v. *Concord R. R. Co.,* 62 N. H. 537, 13 Am. St. Rep.
590; *Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 23 L. Ed. 329;
*Hawes* v. *Oakland,* 104 U. S. 450, 26 L. Ed. 827; *Washburn* v.
*Green,* 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516; *Thomas* v.
*Brownsville etc. Co.,* 109 U. S. 522, 3 Sup. Ct. 315, 27 L. Ed.
1018.

An interested director cannot be counted to make up the quorum so as to authorize or ratify an action taken in his favor. *Bassett* v. *Fairchild,* 132 Cal. 637, 64 Pac. 1082, 52 L. R. A. 611; *Curtin* v. *Salmon River etc. Co.,* 130 Cal. 345, 80 Am. St. Rep. 132, 62 Pac. 552.

A director and officer of a joint stock corporation occupies a fiduciary relation, and his dealings with the subject matter of his trust or agency and with the beneficiary or party whose interest is confided to his care, are viewed with jealousy and distrust by the courts and may be set aside on slight grounds. *Washburn* v. *Green,* 133 U. S. 30, 10 Sup. Ct. 280, 33 L. Ed. 516; *Woodroof* v. *Howes,* 88 Cal. 184–202, 26 Pac. 111; and *Miner* v. *Belle Isle Ice Co.,* 93 Mich. 97, 53 N. W. 218, 17 L. R. A. 412.

Francis J. Heney, and Eugene S. Ives, for Appellees, Steinfeld et al.

Neither the findings nor the evidence are sufficient to support the judgment founded upon the allegations of the complaint. The allegations of the complaint preclude the plaintiff from any reasonable contention that Steinfeld held the stock as trustee for the corporation.

Where the findings are abundantly sustained by the evidence, the established rule of court is that they will not be disturbed by the court. No admissions on the part of the plaintiff will create a trust. A trust must result, if at all, when the papers and the title pass. *Ducie* v. *Ford,* 138 U. S. 587, 11 Sup. Ct. 417, 34 L. Ed. 1091. A constructive trust may only be imposed against one who buys for himself property which it was his duty to buy for another. *Parker* v. *Nickerson,* 137 Mass. 487; *Steinbeck* v. *Bon Homme Min. Co.,* 152 Fed. 333, 81 C. C. A. 441; *Lagarde* v. *Anniston,* 26 Ala. 496, 28 South. 199, 20 Morr. Min. Rep. 545. In order to create a constructive trust it is necessary that either the party who wishes to enforce the trust should have had a then existing interest in the property, or that the action of the stockholders or directors would balk the corporation in effecting the purposes of its creation. The expressions of the defendant are not sufficient to constitute a constructive trust. *Dilts* v. *Stewart,* 43 Leg. Int. (Pa.) 205; *Stonehill* v. *Schwartz,* 129 Ind. 310, 28 N. E. 620; *Acker* v. *Priest,* 92 Iowa, 610, 61 N.

W. 236; *Hamilton* v. *Downer,* 152 Ill. 651, 38 N. E. 733; *Scribner* v. *Meade,* 10 Ariz. 143, 85 Pac. 477.

The test of a constructive trusteeship is the right of the party claiming to be the beneficiary, and therefore the true owner of the property to compel by suit in equity the party holding the legal title to convey or assign the *corpus* of the trust property.    Pomeroy's Equity Jurisprudence, sec. 1058.

One undertaking to procure by decree the creation of a constructive trust must act forthwith and must offer to pay the money which had been advanced by the party against whom the trusteeship is sought to be enforced.    *Hoyt* v. *Latham,* 143 U. S. 553, 12 Sup. Ct. 568, 36 L. Ed. 259; *Patterson* v. *Hewitt,* 195 U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 214; *Wenham* v. *Switzer,* 51 Fed. 351; *Duffield* v. *Michaels,* 97 Fed. 825; *Johnson* v. *Mining Co.,* 148 U. S. 360, 13 Sup. Ct. 585, 37 L. Ed. 480, 17 Morr. Min. Rep. 554.

The agreement of the directors of a company prior to a meeting of the directors, in oral conversation, constitutes a contract of the company.    ''When a corporation consists of a small number of persons, they may transact all their business by conversation without formal votes, and it would be a violation of the plainest principles of justice to hold those who deal with them to prove all their acts by written votes which they do not keep or do not produce.''    *Melledge* v. *Boston etc. Co.,* 59 Mass. (5 Cush.) 158, 51 Am. Dec. 59; *Magowan* v. *Groneweg,* 16 S. D. 29, 91 N. W. 335; 2 Cook on Corporations, 5th ed., sec. 714, pp. 1758, 1759, and notes.

Where findings are silent as to material facts, it will be presumed as against the party having the burden of proof that the court found against him as to such facts.    *Lemster* v. *Warner,* 137 Ind. 79, 36 N. E. 900; *Western Union Tel. Co.* v. *Brown,* 108 Ind. 538, 8 N. E. 171; *Bruner* v. *Brown,* 139 Ind. 600, 38 N. E. 318.

Nothing short of action by all the stockholders in meeting assembled will in itself work a rescission of the contract, and by implication at least that when all the stockholders join in rescinding a contract, their action in itself constitutes a valid rescission.    2 Cook on Corporations, 5th ed., secs. 709, 1721, note; *Colorado Co.* v. *American Co.,* 97 Fed. 843, 38 C. C. A. 433.

SLOAN, J.—This is the second appeal which has been taken in this cause to this court. We reversed the case on the first appeal upon the ground that the judgment which was entered in the court below was not sustained by the findings. 10 Ariz. 221, 86 Pac. 7. The cause was remanded for a new trial. Upon the second trial, by stipulation of counsel, the case was submitted upon the evidence put in upon the first trial, except that certain testimony, deemed by the parties immaterial under the issues, was eliminated. As this record is voluminous, and as both parties have appealed from the judgment, a full statement of the facts is made necessary for a complete understanding of the questions presented for our determination.

Louis Zeckendorf, as a stockholder of the Silver Bell Copper Company and in its behalf, brought this suit against Albert Steinfeld, R. K. Shelton, and J. N. Curtis, individually and as officers and directors of said company, and against the Mammoth Copper Company, to recover for said Silver Bell Copper Company the sum of $338,710.15 and three hundred shares of the stock of the latter which he alleged had been wrongfully appropriated by the defendant Steinfeld, and to be in his possession, and which rightfully was the property of the said company; that this wrongful appropriation was made through the aid and assistance of the defendants Shelton & Curtis, as directors of the Silver Bell Copper Company. The plaintiff prayed for an accounting, the return of the money and shares of stock alleged to have been thus appropriated, and for costs, attorney's fees, and the appointment of a receiver. The answer of the defendants contained a general and specific denial of the wrongdoing complained of, and set up that the money and shares of stock sued for were the property of Steinfeld and rightfully in his possession; that this money represented in part the proceeds from a sale of mining property which had been purchased by him and held in his own name, and which had been sold in conjunction with property belonging to the Silver Bell Copper Company; that the remainder of the money had been rightfully paid Steinfeld in the way of dividends upon the shares of stock of the Silver Bell Copper Company owned by him and standing in his name,

including the three hundred shares of stock mentioned in the complaint; and that these dividends had been declared from the proceeds derived from the sale of the mining property belonging to the company.

The court below gave judgment for the plaintiff for the sum of $20,800, being the amount of the dividends declared upon said three hundred shares of stock after deducting a certain sum paid out by Steinfeld in the purchase of the same from the original owner, and denied him any relief upon the cause of action set up in the complaint based upon the alleged misappropriation of the proceeds of the sale of the mining property claimed by Steinfeld as his individual property, the title to which was in his name. The court appointed a receiver to disburse the money thus adjudged to be wrongfully appropriated among the stockholders of the Silver Bell Copper Company and to close up the affairs of the latter company. From this judgment both parties have appealed.

The court found the facts to be as follows: From 1878, and during all the times herein mentioned, the plaintiff, Louis Zeckendorf, and the defendant Albert Steinfeld were partners engaged in the mercantile business in Tucson under the name of L. Zeckendorf & Co. The defendant Steinfeld, under the terms of the partnership, was the active manager and in the control of the business of the firm. The plaintiff was a resident of the city of New York, and only occasionally visited the territory. As ancillary to their business, the firm became more or less interested in various mining enterprises. A property situated in Pima county, known as the "Old Boot Mine," prior to January, 1899, was held by Steinfeld as trustee for William Zeckendorf and his wife, Julia Zeckendorf. One Carl Nielsen had been given a contract by Steinfeld for working and operating said property on a royalty, and had become indebted to the firm of L. Zeckendorf & Co. in the operation of the mine. On the last-mentioned date, in order to protect the firm on account of this indebtedness, Steinfeld caused a corporation to be formed under the name of the "Nielsen Mining and Smelting Company," to which was transferred Nielsen's interest under his contract, the machinery and other personal property owned by him and used in its operation, in consideration of all of its capital stock and the assumption by the corporation of his debts to L. Zeckendorf & Co. At the time

of the organization of the company, Steinfeld, as trustee for William and Julia Zeckendorf, gave the corporation an option to purchase the Old Boot mine for $25,000, payable in installments of $2,500 each. Nielsen assigned to L. Zeckendorf & Co. six hundred and seventy shares of the capital stock, and to Steinfeld as trustee thirty shares of the capital stock, retaining for himself the balance of three hundred shares of the capital stock. The firm of L. Zeckendorf & Co. put one share in the name of the defendant Shelton, to qualify him as a director, and gave one hundred and seventy shares to defendant Curtis, in consideration of services thereafter to be performed by the latter for the company and retained four hundred and ninety-nine shares for itself. The authorized capital stock of the company was $25,000. The defendant Shelton was an employee of L. Zeckendorf & Co., and the defendant Curtis had charge of the mining business of the firm. Curtis was elected director and president of the company, and Shelton director and secretary. Nielsen was elected a director, and became manager and superintendent of the company. Steinfeld, while not an officer or director of the company was, nevertheless, recognized as the ruling manager of the corporation, and was, in fact, in control, through the officers, of its affairs. The name of the corporation was subsequently changed to the Silver Bell Copper Company, and we will hereafter speak of it by this name.

Adjacent to and surrounding the Old Boot mine was a group of mining claims known as the "English group," which was owned, at the time of the organization of the corporation, by residents of England. On the 1st of January, 1900, these mining claims were relocated by one Francis and one Volkert, under the claim that the title of the English owners had become forfeited. Steinfeld, through Curtis, and his relations to the corporation and from personal inspection, learned that the English group contained ore bodies of great value, and that the ore body in the Old Boot mine extended into the ground embraced in the English group, and was advised by Curtis that it was desirable that the title to the English group should be acquired so that the two properties might be held and sold as one group, thereby increasing the value of the company's property. Early in the year 1900 Steinfeld became dissatisfied with Nielsen's management of the property, and deter-

mined to get rid of him by buying his shares of stock. Under
the advice of Steinfeld the directors discharged Nielsen and
appointed Curtis in his place, and stopped work on the Old
Boot mine.

The court found that Steinfeld's purposes in closing the
mine were to effect a purchase from Nielsen of the three hun-
dred shares of stock held by him, and also that the English
group of mines might be purchased from the English owners,
as well as the Francis-Volkert title, at a nominal or small sum;
that although the mine was paying, and at the time worked
at a profit, its closing down was to prevent the owners of the
English group from obtaining knowledge that the ore body
of the Old Boot property did and would extend into the
ground covered by the English group.

At the time of the closing down of the Old Boot mine, the
Silver Bell Copper Company was indebted to L. Zeckendorf
& Co. about $30,000 in excess of the value of matte and bullion
held by the latter as security for the company's indebtedness.
On May 16, 1900, Steinfeld purchased the title held by Fran-
cis and Volkert to the English group; at the same time he
organized the Mammoth Copper Company for the purpose of
taking over this title. The stock of this company was in fact
owned and held by Steinfeld individually. On June 29, 1900,
an agreement was entered into by and between Steinfeld and
the Silver Bell Copper Company, as parties of the first part,
and Nielsen and his wife, as parties of the second part, where-
by the latter was to sell to the former the three hundred shares
of stock belonging to Nielsen, together with an interest in two
mining claims adjoining the Old Boot, in consideration of
$2,000 to be paid Nielsen in cash, and the further sum of $10,-
000 which was to be paid out of the proceeds of a sale of said
mine. After this agreement was executed the three hundred
shares of stock were thereupon transferred on the books of the
company to Steinfeld as trustee. In December, 1900, Stein-
feld went to England and there acquired the title to the Eng-
lish group from the English owners, and took the title in his
own name. He paid for this title with his own money.

The court found that Steinfeld, in making the purchases of
the Francis-Volkert title and of the English title to the Eng-
lish group, intended that the property should be his own and
not the property of the Silver Bell Copper Company, but

did have the purpose and intent of offering to the company the opportunity to take over the title in consideration of its reimbursing him for his outlay in acquiring said title; that he expected the corporation would do this, but, should it not, he would then hold it as his own. Soon after the purchase by Steinfeld of the English title, Curtis consulted with S. M. Franklin, the attorney for the Silver Bell Copper Company, and who was also the attorney for L. Zeckendorf & Co., and the defendant Steinfeld, with regard to the ownership of the three hundred shares of stock purchased from Neilsen and the English group. Steinfeld was then claiming to be the owner of both the stock and the mines. As a result of this action of Curtis, Franklin told Steinfeld that under the circumstances of his purchases he held both the stock and the English group as trustee for the Silver Bell Copper Company; that because of his relation to the company he had neither the right to purchase the stock or mines for himself, nor the right to compel the company to assume the purchases without the consent of its stockholders at a meeting at which some one other than Steinfeld should vote the shares belonging to L. Zeckendorf & Co., and that if the corporation should then refuse to ratify the transactions Steinfeld could then rightfully thereafter hold the stock and mines as his own. Acting under this advice, on July 15, 1901, Steinfeld handed to Shelton, secretary of the company, an agreement signed by himself and addressed to the company, in which he recited in detail the circumstances of his purchase of the English group of mines and of the Nielsen stock and the interest in the mining claims held by him, and the terms under which the Nielsen stock purchase was made, and stated his willingness to sell and convey both the English group and the shares of stock to the company upon its paying him the money which he had expended in the purchase thereof, with interest, and upon its assuming and guaranteeing to carry out the terms of the Nielsen contract of purchase, as well as the contract of purchase of the Francis-Volkert title, on or before October 15, 1901, and would further agree in writing to do· the annual assessment work on the mines. It was further expressed in the agreement that if the company should fail to carry out the terms of the proposition, then Steinfeld would thereafter hold the property as his own. After the receipt of this document from Steinfeld, the board

of directors of the company on the same date adopted a resolution calling for the holding of a stockholders' meeting to take appropriate action on Steinfeld's proffer, but no stockholders' meeting was in fact called or held under this resolution, and no action was taken by the stockholders under it. On October 1, 1901, at a meeting of the stockholders of the company, it was agreed by Steinfeld, in consideration of the corporation doing the assessment work on the mines for the years 1900, 1901, 1902, to extend his proposition of July 15, 1901, to September 15, 1902. It was resolved at this meeting that a stockholders' meeting should be called to act on Steinfeld's proposition not later than September 15, 1902, but no stockholders' meeting was ever called or held for this purpose, nor was any action taken by the stockholders under this resolution. During all the time that the proposition of Steinfeld was pending the Silver Bell Copper Company was in possession of the English group, and worked and operated it in connection with the Old Boot mine. In 1901 and at other times Curtis, under the direction of Steinfeld, made various maps and reports of the property, in which the English group was spoken of as part of the Silver Bell Copper Company's property. These maps and reports were sent to plaintiff and others, and various efforts made by Steinfeld to sell the property as a whole, including the English group. As the result of these efforts to sell, on May 20, 1903, the Imperial Copper Company entered into an agreement with the Silver Bell Copper Company and with Steinfeld and the Mammoth Copper Company for the purchase of the entire property for the sum of $515,-000. In this agreement Steinfeld individually guaranteed the title to the mines for a definite length of time. The terms of the sale called for the payment of $115,000 cash, and four notes of $100,000 each made payable to the Silver Bell Copper Company. It was further agreed that these notes and their proceeds should be held by Steinfeld until released from his personal obligation in guaranteeing said title. On the same day an agreement in writing was executed by J. N. Curtis, as president of the Silver Bell Copper Company and in its name, and by Steinfeld and the Mammoth Copper Company, which read as follows:

"This agreement made this 20th day of May, 1903, between the Silver Bell Copper Company, a corporation organized and

XII Ariz.—17

existing under the laws of the territory of Arizona, party of the first part, and the Mammoth Copper Company, a corporation organized and existing under the laws of the territory of Arizona, party of the second part, and Albert Steinfeld, of Tucson, party of the third part, witnesseth:

"Whereas, the parties hereto have this day agreed to sell certain mining claims and property to the Imperial Copper Company, a corporation, as per written agreements heretofore made, and deeds for which property are now in escrow with the Phoenix National Bank, of Phoenix, Ariz.; and

"Whereas, the parties hereto desire to settle and determine as between themselves, what disposition shall be made of the proceeds of the sale; and

"Whereas, the said Albert Steinfeld has assumed certain obligations with the said Imperial Copper Company, as more fully appears in the various agreements heretofore entered into by him in making this sale, and particularly in a certain guarantee agreement, wherein, amongst other things said Steinfeld guarantees the title to certain mining claims so sold or agreed to be sold, and the parties of the first part desire to indemnify him against loss by reason of any of the said matters or things so done by him.

"Now, therefore, in consideration of the premises, and of the sum of one dollar ($1.00) by each of the parties hereto to the other in hand paid, receipt whereof is hereby acknowledged, it is hereby mutually agreed that the purchase price paid and to be paid upon the sale, shall belong to and be the property of the said Silver Bell Copper Company.

"And it is further agreed that the four promissory notes of one hundred thousand dollars ($100,000.00) each, this day executed by the Imperial Copper Company, to the Silver Bell Copper Company, upon said sale, as well as the proceeds of said promissory notes when collected, shall be paid to the said Albert Steinfeld, as trustee, and as security for, and indemnity against loss, damage or expense which may arise to him for or out of, or by reason of any and all obligations and liabilities which he has assumed with the said Imperial Copper Company, or any other person whatsoever.

"And it is further agreed that no dividend shall be declared by the said Silver Bell Copper Company until the stockholders

of said company shall first have fully indemnified said Albert Steinfeld against loss, which might arise to him in the future, from or on account of any such obligations or liabilities so assumed by him.''

After the agreement of sale had been executed, and on the same day, the board of directors of the Silver Bell Copper Company met to take action upon the matter of the sale and the ratification of the above agreement. The minutes of the meeting recite that the president reported the fact of the agreement of sale and the terms thereof, and also of the agreement between the Silver Bell Copper Company, Albert Steinfeld, and the Mammoth Copper Company guaranteeing Steinfeld from any loss by virtue of his guaranty agreement with the Imperial Copper Company. They further recite that Steinfeld had again submitted for acceptance the proposition which had theretofore been submitted by him on the fifteenth day of July, 1901, and later extended until September 15, 1902, with the additional provisions that the company should assume and pay a commission which Steinfeld had agreed to pay for negotiating the sale to the Imperial Copper Company and should be indemnified against loss by reason of another asserted claim for a commission; and, further, that the company should indemnify him against loss, damage, or expense by reason of his having guaranteed the titles to the mines sold to the Imperial Copper Company as set forth in the guaranty agreement between the Silver Bell Copper Company, the Mammoth Copper Company, and Steinfeld. The minutes further recite that thereupon a resolution was adopted accepting Steinfeld's proposition and ratifying, approving, and confirming the sale to the Imperial Copper Company and the agreement of indemnity made by the company with the Mammoth Copper Company and Steinfeld. After the execution of these agreements and the ratification of the same by the board of directors the proceeds of the sale, including the promissory notes, were turned over to Steinfeld under the agreement and by him deposited in a bank in San Francisco, except the sum of $51,500, which had been attached in a suit against the Silver Bell Copper Company which was filed after the sale had been made to the Imperial Copper Company. The plaintiff, Zeckendorf, being dissatisfied with the disposition made of the proceeds of the sale, brought a suit in San

Francisco on behalf of the company to recover the same. On December 26, 1903, a meeting of the stockholders of the Silver Bell Copper Company was held in Tucson, at which both Zeckendorf and Steinfeld were present and an attorney representing each, as were also Shelton and Curtis. The purpose of this meeting was to adjust the difficulties which had arisen between Zeckendorf and Steinfeld growing out of the disposition of the proceeds of the sale and the litigation which had been instituted by Zeckendorf in relation thereto. At this meeting a resolution was passed rescinding and annulling the agreement of May 20, 1903, and the resolution of the board of directors of the same date. In the resolution was set forth a copy of the agreement of May 20th, and the resolution of the board specifically referred to, and both were declared to be null and void. This action of the stockholders was taken with the consent and acquiescence of all the parties to the agreement of May 20th. After the adjournment of the stockholders' meeting the board of directors of the Silver Bell Copper Company met and adopted a similar resolution. At this meeting Steinfeld resigned as treasurer of the company, and Curtis was elected treasurer in his stead. Steinfeld then paid to Curtis the sum of $18,117, which had theretofore been paid to him under the agreement and resolution of May 20th, and turned over to Curtis all the funds in his hands of the proceeds of the sale, except the sum of $51,500, which had been garnished in said suit, and gave to Curtis an order upon the Bank of California to deliver the money and notes which had been deposited by him as aforesaid. On January 16th the board of directors of the Silver Bell Copper Company met and adopted a resolution partitioning the proceeds of the sale to the Imperial Copper Company, then in the treasury of the Silver Bell Copper Company, between Steinfeld and the company. Under the terms of this partition Steinfeld received the sum of $145,743.75 and one of the promissory notes for $100,000 given by the Imperial Copper Company as the amount due him of the proceeds of the sale of the English group of mines, the title to which he held. There was present at this meeting Shelton, Curtis, Steinfeld, and Eugene S. Ives, the latter acting as the attorney of Steinfeld. On the twentieth day of January, 1904, the directors of the company again met and passed a resolution declaring a dividend of $111 per share

of the capital stock of the Silver Bell Copper Company. Under this dividend the sum of $33,300 was paid Steinfeld on the three hundred shares standing in his name as trustee, and which had been purchased from Nielsen.

The court, in addition to these facts, found that all the money paid out by Steinfeld in the purchase of the Francis-Volkert title and the English title to the English group of mines, and the $2,000 paid in the purchase of the three hundred shares of stock, was the personal money of Steinfeld, and that at no time prior to the twentieth day of May, 1903, did the Silver Bell Copper Company offer or agree to repay Steinfeld any of said money, or to assume any obligation which Steinfeld had incurred in the purchase of the Francis-Volkert title.

As we have stated, both parties have appealed from the judgment.

We will consider first Zeckendorf's appeal. His essential grievance is in the refusal of the trial court to grant any relief upon the cause of action set forth in his complaint based upon the claim that Steinfeld, at the time of the sale to the Imperial Copper Company, held the legal title to the English group of mines as the trustee of the Silver Bell Copper Company. Counsel for appellant Zeckendorf present two views of the case bearing upon this point. They urge, first, that under the facts and circumstances surrounding the purchase of the English group of mines by Steinfeld, and from his expressed intention at the time, he should be held to be a trustee *ex maleficio* from the time of the purchase; they also urge that if he was not a trustee from the time of the purchase he became such under the agreement of May 20, 1903, and the resolution of the directors of the Silver Bell Copper Company of that date, accepting his proffer to renew the option of July 15, 1901. We will consider these in their order.

The law is that one may not purchase and hold, as his own, property which he is in duty bound to purchase and hold for another. *Winn* v. *Dillon,* 27 Miss. 494; *Davis* v. *Hamlin,* 108 Ill. 39, 48 Am. Rep. 541; *Gardner* v. *Ogden,* 22 N. Y. 327, 78 Am. Dec. 192. This rule applies to officers and directors of a corporation, as to other persons sustaining fiduciary relations to others. Whether in any case an officer of a corporation is in duty bound to purchase property for the corporation, or to

refrain from purchasing property for himself, depends upon whether the corporation has an interest, actual or in expectancy, in the property, or whether the purchase of the property by the officer or director may hinder or defeat the plans and purposes of the corporation in the carrying on or development of the legitimate business for which it was created. *Trice* v. *Comstock*, 121 Fed. 620, 57 C. C. A. 646, 61 L. R. A. 176. We think the rule as thus stated is as broad as the authorities will sustain. Was Steinfeld in such relation to the Silver Bell Copper Company at the time of his purchase of the English group of mines as to have made it his duty either to purchase the same for the company or to refrain from purchasing it for himself? Steinfeld was not at the time a director of the Silver Bell Copper Company, yet, as found by the court, as managing partner of L. Zeckendorf & Co., he dominated the affairs of the corporation through its board of directors. This being so, he should be held doubtless to the same rule governing persons holding fiduciary or confidential relations to a corporation as though he were himself an officer or director. He obtained knowledge of the value of the English group of mines wholly by reason of his connection with the affairs of the company, and largely from the reports of Curtis, the superintendent. In purchasing the property he had in mind what had previously been told him by Curtis to the effect that the acquisition of the English group and the joining of it with the company's property in case of sale would greatly add to the value of each. As against this view, it should not be overlooked that at the time of the acquisition of the titles to the English group by Steinfeld the Silver Bell Copper Company was indebted to L. Zeckendorf & Co. in an amount exceeding its capitalization, with no available resources which could be utilized to effect a purchase of the English group. Steinfeld did not prevent the company from making the purchase by any representation to the officers of the company or to the board of directors that he intended to and would obtain the property for the company. It is urged by counsel for appellant that he was in a situation to have made the purchase on behalf of the company by personally advancing the money needed for that purpose, or by obtaining the same from the firm of L. Zeckendorf & Co. The answer to this is that to hold that an officer or director of a corpora-

tion is under any duty to such corporation to loan money or to purchase out of his own funds property for the use of the corporation would be enlarging the duty of an officer or director of a corporation beyond any point to which the law of trust has ever gone. The same is true as to the suggestion that Steinfeld should have used the money of L. Zeckendorf & Co. for that purpose; even had he authority under the terms of the partnership to use money for such purpose, he was certainly under no obligation to the corporation to do so.

It is further urged that Steinfeld's action in causing the closing down of the Old Boot mine prior to his purchase of the English group was unjustifiable, and an injury to the company, and was intended by him to make it easy to purchase the English group of mines and to affect the price for which the property could be bought. These arguments would be forceful if it could be determined from the facts that the closing down of the Old Boot mine prevented the corporation from obtaining the English group, or in any way so changed the relations of the corporation to the owners of the English group as to hamper or impede the corporation in any plan or purpose it had in relation thereto. Further, it is not apparent, either in the findings or elsewhere in the record, that the closing down of the Old Boot mine did, as a matter of fact, have any influence over the minds of the owners of the English group to induce them to sell to Steinfeld, or had any influence over the price for which they sold, even if we should regard either of these matters as bearing upon the duty of Steinfeld to the Silver Bell Copper Company in the matter of the purchase. Giving due weight to the facts connected with the purchase of the English group by Steinfeld, and the relations of Steinfeld to the company at the time, it cannot be said as a matter of law that Steinfeld in purchasing the property for himself violated any duty he owed to the Silver Bell Copper Company. It follows, therefore, that the finding of the trial court is in this regard fully sustained.

The court found that Steinfeld, before purchasing the English group of mines, had at different times written Zeckendorf, his partner, that it was very desirable that the English group should be purchased so that it could be joined with the Old Boot property and the whole sold as one group and one property, and that it was his intention to acquire the English

group for this purpose. It must be remembered that the plaintiff, Zeckendorf, is here in the capacity of a stockholder of the Silver Bell Copper Company seeking relief on behalf of the company. We are, therefore, not concerned with the question whether Steinfeld, in purchasing the property for himself, has violated any duty he owed to Zeckendorf as a member of the firm of L. Zeckendorf & Co. Steinfeld's expression of intention to Zeckendorf can have little bearing on the question under consideration, unless it should appear that his promise to purchase for the company was made or intended to be made to Zeckendorf as a stockholder of the company, and through him to affect in some way the subsequent conduct and relations of the corporation to the property, as by inducing the company to refrain from purchasing the property or from making any effort thereto; that it was so intended, or did as a matter of fact have any such effect, does not appear from anything in the record we have been able to discover. Certainly the findings do not so disclose. If Steinfeld had expressed an intention directly to the officers or directors of the Silver Bell Copper Company of purchasing, for the benefit of the company, the English group, such an expressed intention would not have constituted Steinfeld a trustee *ex maleficio,* unless his failure to carry into effect this intention had so changed the relations or situation of the corporation to its disadvantage with respect to the property as would amount to constructive fraud. *Scribner* v. *Meade,* 10 Ariz. 143, 85 Pac. 477. Unless the corporation parted with something or lost or was deprived of something of value by virtue of such promise, there was no fraud, and Steinfeld was in the relation of a mere volunteer, free to carry out his expressed intent or not as he might thereafter choose. *Piedmont L. & I. Co.* v. *Piedmont Foundry & M. Co.,* 96 Ala. 389, 11 South. 332; *Pearson* v. *Pearson,* 125 Ind. 341, 25 N. E. 342; *Stonehill* v. *Swartz,* 129 Ind. 310, 28 N. E. 620.

We find no ground for the application of the doctrine of equitable estoppel to this case. It is true that the Silver Bell Copper Company went into possession of the English group after its purchase by Steinfeld and was given by the latter the right of working the same and treating any ores that might be taken from the same in the company's smelter. It it likewise true that maps and reports were made showing the

English group as a part of the Silver Bell Copper Company's property, and that these maps and reports were made with the knowledge and acquiescence of Steinfeld for the purpose of effecting the sale of the entire property as a group. Under the settled rules governing the subject of equitable estoppel, before such estoppel could be predicated upon these circumstances it should appear that the corporation had been induced thereby to expend money on the property, which it otherwise would not have spent, or to incur some liability with respect thereto under the belief, entertained in good faith and occasioned by the conduct or statements of Steinfeld, that it was the equitable owner of the property. It does not appear that the Silver Bell Copper Company expended money on the English group of mines in excess of what it got out of the property, under a belief that it was the equitable owner of the same, nor does it appear that it had borrowed money or increased its indebtedness or had become obligated to others in any way upon the credit of its beneficiary or equitable ownership of the English group. The assessment work upon the English group appears to have been done by the company under an agreement with Steinfeld, which was part consideration for his extension of the option of July 15, 1901. Under no view of the facts and of the law are we able to arrive at any different conclusion as to the nature of the title held by Steinfeld to the English group of mines prior to May 20, 1903, than that reached by the trial court.

The facts found by the court show that the contract of May 20, 1903, between the Silver Bell Copper Company and Steinfeld and the Mammoth Copper Company, in which Steinfeld's renewal of his option of July 15, 1901, with certain modifications, was accepted, among other provisions, was rescinded by the stockholders of the company, with the acquiescence of Steinfeld and the Mammoth Copper Company, on the twenty-sixth day of December, 1903. Upon the first hearing of this case we held that this rescission operated to put the parties where they were before the contract was made. As the option to take over the English group given by Steinfeld had never been exercised by the company prior to May 20, 1903, and was only exercised then through said contract, the rescission of the latter left the parties as though the contract had never been entered into. On the record, therefore, there was no

acceptance of Steinfeld's proffer, and the Silver Bell Copper Company did not become an equitable or legal owner of the English group under the option, and the trial court did not err in so holding.

Counsel for appellants urge that, without regard to the question of title to the English group, the plaintiff is entitled on behalf of the company to recover possession of the whole of the money paid over to Steinfeld, for the reason that the resolution of the board of directors, on January 16, 1904, under which the money and note were paid over to Steinfeld, was voidable if not void, at the suit of any party interested therein. The reason given why this resolution is at least voidable is that Steinfeld was at the time a director of the Silver Bell Copper Company and voted for the resolution, and that one, if not both, of the other directors was under his domination and control. Assuming the facts to be as thus urged, yet it does not follow that the acts done under the resolution should be declared null and void, and the money paid over to Steinfeld be required to be again placed in the treasury of the company, unless there be some unfairness in the transaction apart from the circumstances under which the resolution was made. *Twin Lick Co.* v. *Marbury,* 91 U. S. 587, 23 L. Ed. 328. Therefore, before Steinfeld should be required to pay back into the treasury of the company the money and note turned over to him, it should appear that he was either paid an undue amount, or that no distribution of the proceeds of the sale should at the time, in fairness to the company, have been made. There is no showing that the amount paid Steinfeld under this resolution as his part of the proceeds of the sale due to him as the owner of the English group of mines was in excess of what he should have been paid, nor was it shown that the distribution was prematurely made. The pleadings do not raise this issue; on the contrary, by stipulation of counsel, all testimony which had been put in upon the first trial as to the relative values of the Old Boot and English group of mines was eliminated upon the ground that the complaint proffered no issue as to such values.

We come now to the question raised by the appellees under their cross-appeal, and that is, Was Steinfeld a trustee of the Silver Bell Copper Company for the three hundred shares of stock purchased from Nielsen? We think the facts fairly

sustain the findings of the court that he was. The circumstances connected with the sale indicate that he bought the shares of stock for the company. The contract of purchase was in the name of Steinfeld and the Silver Bell Copper Company, and the agreement was that Nielsen was to be paid the sum of $10,000 of the purchase price from the proceeds of the working of the Old Boot mine or from its sale. In addition to this, the transfer of the stock was made from Nielsen to Steinfeld as trustee. Presumably, therefore, as the company was directly interested by the terms of the purchase in the sale, Steinfeld held as trustee for the corporation. The holding of the trial court that he was such trustee is thus abundantly sustained by the facts.

The action of the trial court in appointing a receiver under the circumstances is not subject to just criticism. It appears that the Silver Bell Copper Company had ceased to do business, and its affairs were ready to be closed. It is not contended that any different disposition of the money found to be due from Steinfeld should or would be made by the company than is to be made by the receiver, namely, its distribution among the stockholders of the Silver Bell Copper Company.

Counsel for appellant Zeckendorf complain of the amount allowed them by the trial court as attorneys for the plaintiff. As this was a matter within the sound discretion of the court, and as we cannot say as a matter of law that this discretion was abused, we may not modify or change the judgment in this behalf.

The judgment is affirmed.

KENT, C. J., and DOAN and NAVE, JJ., concur.